MATTOS, INC. *v.* CHESTER L. HASH ET AL.

[No. 68, September Term, 1976.]

*Decided February 8, 1977.*

372

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*J. Joseph Barse*, with whom was *Hal Thurston* on the brief, for appellant.

*Kevin J. McCarthy*, with whom were *Shipley, O'Malley & Miles* on the brief, for appellees.

LEVINE, J., delivered the opinion of the Court.

This appeal arises from a claim for personal injuries sustained by appellee while employed as an automobile body repairman. In an action for negligence and breach of warranty brought by him in the Circuit Court for Prince George's County, a jury awarded damages totalling $227,574

to appellee, his wife, and Liberty Mutual Insurance Company, which had made workmen's compensation payments to appellee. Appellant, against whom the judgment had been rendered, noted an appeal to the Court of Special Appeals, but we granted certiorari prior to consideration of the case by that court. The thrust of the appeal centers on appellant's claim that the trial judge (Couch, J.) erred in refusing to grant its motion for directed verdict. Since we think the case was properly submitted to the jury, we shall affirm.

The accident in which appellee sustained his injuries occurred on April 8, 1974, in the body repair shop of Sheehy Ford, where appellee was attempting to realign the body of a Mustang automobile which had been badly damaged. To accomplish the realignment, he was using a large machine, loosely resembling a lift found in most service stations and repair garages, bearing in this instance the tradename "Align Rite." In the operation of this machine, the automobile is placed on  appropriately secured tracks, and then clamps, which are affixed to the part of the frame or sheet metal requiring realignment, are connected by bars to vertical stanchions which form part of the machine. The object, in rudimentary terms, is to straighten the body by manually applying pressure with foot-operated pedals so as to pull the damaged areas into correct alignment. This particular "Align Rite" machine was purchased by Sheehy Ford from appellant some five years prior to the accident which injured appellee.

Whether the clamps in a given instance are to be attached to sheet metal or to a frame depends on whether the automobile body is one built on a frame or whether, as in the case of the Mustang, it is "unitized." Heavy metal girders make up the conventional frame to which separate pieces of sheet metal are bolted. The newer automobiles, particularly those which are small, are frequently built with a "unitized" body, consisting of sheet metal which is welded together; the strength of the body derives from the sheets of metal.

Prior to purchase of the clamp in question, a recurring problem had been encountered in aligning a "unitized" body.

Theoretically, the clamps were expected to retain their grip on the sheet metal even under the extreme pressure of the aligning machine, but in actual practice this had not always been true because the clamps were designed to be attached only to the edge of the sheet metal. Approximately one year before the accident, a salesman employed by appellant visited Sheehy Ford and showed appellee a newly designed set of clamps which could be attached to any part of the sheet metal surface. These clamps were designed therefore to afford improved gripping ability. The salesman informed appellee, according to the latter, that the new clamps had been built by the same company, Roger Manufacturing, which had built the clamps that had originally accompanied the Align Rite machine, and further indicated to appellee that the new clamps could be used with that machine. Impressed with both what he had seen and had learned from the salesman, appellee requested that his employer purchase the new clamps. This was done, and appellee, as did other employees at Sheehy Ford, proceeded to use the clamps with satisfactory results in the one year prior to the accident.

On the occasion of his accident, appellee attached one of the clamps purchased from appellant to the sheet metal of the Mustang "on the right front fender skirt, approximately six inches above the main structure of the chassis and . . . just about six inches forward of what they call the spring guard . . . ." The clamp was attached to a bar, which, in turn, was secured by an "S" hook to the upright stanchion of the machine. He then began to apply pressure by stepping on the control pedal which was located to the front of the automobile. The machine had a maximum pulling capability of 10 tons, but there were no gauges or other instruments which would permit the mechanic to determine how much force was being exerted at any given time.

After applying what he regarded as the "normal amount of pressure" necessary to straighten this particular body damage, appellee looked beneath the vehicle to make certain that the clamp had not lost its grip and that "none of the side skirt had pulled away from the cowl." He then went forward with the intention of inspecting the alignment

gauges. As he was passing the area then being straightened by the machine, he heard a noise and instantly found himself lying on the floor. The force of the machine, it was later discovered, had ripped the clamp apart, and the bar connected to the clamp by a hook had torn free and struck appellee in the head. Never before in his 28-year career had appellee encountered a broken clamp. Tests conducted after the accident by a metallurgist, who later testified as an expert witness for appellee, disclosed that two clamps identical to the one used by appellee were capable of withstanding pressures of 15,100 pounds and 15,900 pounds, respectively, as opposed to the 20,000 pound, or 10-ton, capacity of the machine. The clamp material, he found, was not defective; the clamp was simply not large enough to resist the force apparently created by the machine at the time of the accident.

At the conclusion of appellee's case, which sounded in negligence and in breach of warranty, the court denied appellant's motion for a directed verdict and, after appellant declined to present any evidence, submitted the case to the jury on special issues. The jury found appellant guilty of negligence and breach of warranty. It further found that appellant's conduct was a proximate cause of the injury, that appellee was free of contributory negligence and that he had not assumed the risk.

On appeal, appellant advances three contentions:

(1) That appellee, although a third party beneficiary of the transaction in which appellant sold the clamps to appellee's employer, was nevertheless required to give notice of his injuries and the breach of warranty to appellant.

(2) That appellee presented insufficient evidence of either negligence or breach of warranty to justify submission of the case to the jury.

(3) That appellee was guilty of contributory negligence as a matter of law.

Since we have concluded that there was sufficient evidence to warrant submission of the breach of warranty claim to the jury, we need not consider the negligence question.

## (1)

As a threshold proposition, we turn first to the question of whether appellee, though not the purchaser of the clamps, was nonetheless required by the Uniform Commercial Code (the U.C.C.) to give notice of the breach of warranty as a precondition to obtaining relief. Appellant observes, in this connection, that it was not informed of the breach until served with the suit papers some 11 months after appellee sustained his injuries. The statutory requirement which appellant seeks to invoke here is found in § 2-607 (3) (a) of the U.C.C., codified in this state as Maryland Code (1975), § 2-607 (3) (a) of the Commercial Law Article. It provides:

"(3) Where a tender has been accepted

"(a) The *buyer* must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy[.]" (Emphasis added).

Appellant argues that if appellee, as a non-purchaser, is to come within the enlarged class of third party beneficiaries entitled to warranty protection under the 1969 amendments to § 2-318 of the U.C.C., so also should he be bound by the notice requirement of § 2-607, contained within the same title of the U.C.C.

Prior to argument in this case, but shortly after appellant's brief was filed, we considered the very point raised here in *Frericks v. General Motors Corp.*, 278 Md. 304, 309-16, 363 A. 2d 460 (1976), which we think is controlling. There, relief was sought for breach of warranty and negligence by an automobile passenger, who was a non-purchaser, for injuries sustained because of a design defect in the automobile. There also, the notice requirement of § 2-607 was interposed as a defense in the face of the plaintiff's failure to give notice of the breach of warranty to the seller of the automobile, as in this case, prior to filing suit. We held in *Frericks* that the third party beneficiary, because he was a non-purchaser, was not required by § 2-607 to notify the seller of a breach of warranty, and was therefore not precluded from pursuing his remedy under the

U.C.C. In so holding, we relied in part on the § 2-103 (1) (a) definition of a "buyer" as a "person who buys or contracts to buy goods."

A purpose of the notice requirement, we recognized in *Frericks*, was to inform the seller of a defect in the product, thus enabling him to correct the defect, if possible, and to minimize any damages. Judge Eldridge for the Court, aptly responded with the observation that "[i]n a case involving a personal injury to a non-buyer, the requirement [of § 2-607] would seem to serve no purpose, as it would be impossible to correct the defect or minimize damages after the injury has already occurred." *Frericks v. General Motors Corp.*, 278 Md. at 313. The defendants in *Frericks* argued, however, that a further purpose of the notice requirement was to protect the seller from stale claims and to enable him to marshal evidence for a defense. But we concluded that it was the function of the applicable statute of limitations, contained in § 2-725 of the U.C.C., to protect sellers against stale claims.

Fully cognizant of the implications of our holding in *Frericks*, appellant nonetheless argued before us, in effect, that this case is distinguishable on the facts, since, for all practical purposes, appellee, not his employer, was the buyer of the clamps. It was appellee, appellant maintains, who dealt directly with the salesman and who requested that the purchasing department buy the clamps. It was therefore as if appellee himself had been the buyer of the clamps and not, as he urges here, merely a third party beneficiary. Accordingly, appellant argues, appellee should have given the same notice within a reasonable time after the accident that would have been required of his employer had any of its property been damaged by the broken clamp. We disagree.

The short answer to appellant's contention is that no provision was made for it in the statute. In *Frericks v. General Motors Corp.*, 278 Md. at 314, we emphasized that the language of § 2-607 was unambiguous in delineating when the seller was to be notified of a breach. Section 2-607, we said, "requires only the 'buyer' to notify the seller of a breach, and § 2-103 clearly defines 'buyer' so as to exclude third party beneficiaries." 278 Md. at 314. We also focused in

*Frericks* on the 1969 amendments to §§ 2-314 and 2-318, dealing respectively with warranties of merchantability and third party beneficiaries. By those amendments, the Legislature, as we observed earlier, eliminated the requirement of privity as to manufacturers and sellers within the distributive chain and enlarged the class of persons to be protected by warranties in the event of personal injury caused by defective products. Yet, while thus redefining the word "seller," as used in the warranty provisions, to include manufacturers and others in the distributive chain, the Legislature did not similarly redefine the word "buyer" to include the expanded class of third party beneficiaries. This, we observed, was an indication "that while the remedial rights of the [U.C.C.] were to be extended to an enlarged class of persons, the procedural obligation of notice imposed on *actual* buyers was not to be extended to that group." 278 Md. at 315 (emphasis added).

In light of the 1969 amendments, the Legislature's retention of the definition of "buyer" as a "person who buys or contracts to buy goods" is no less significant here than it was in *Frericks.* As we suggested not only in *Frericks*, but subsequently in *Phipps v. General Motors Corp.*, 278 Md. 337, 349-50, 363 A. 2d 955 (1976), it is "an *actual* buyer" (emphasis added) who is required by § 2-607 to give notice. Appellee was no more the buyer of the clamps, and no less a third party beneficiary, than would have been any other ultimate consumer who, within the contemplation of § 2-318, used a defective product purchased by another person. *Cf. Chaffin v. Atlanta Coca Cola Bottling Co.*, 127 Ga. App. 619, 194 S.E.2d 513 (1972) (daughter purchased bottle of contaminated soda which she gave to mother, who was held to be third party beneficiary and therefore not required to give notice under § 2-607).

Accordingly, appellee's breach of warranty claim was not barred by his failure to notify the seller of the breach prior to filing suit.

(2)

Although appellee alleged a breach of both express and implied warranties in his declaration, it is apparent from a

review of the record that the case was tried to its conclusion on the theory of implied warranty. We therefore shall confine within this context our consideration of appellant's argument that the trial court should have directed a verdict for insufficiency of evidence, particularly since, as noted at the outset, we also find it unnecessary to address the negligence issue.

In an action brought for breach of implied warranty of merchantability under § 2-314 of the U.C.C., it is necessary to show not only that the warranty existed, but also that it was breached and that the breach was the proximate cause of the injury. *Giant Food, Inc. v. Wash. Coca-Cola,* 273 Md. 592, 602, 332 A: 2d 1 (1975), *aff'g Sheeskin v. Giant Food, Inc.,* 20 Md. App. 611, 620-21, 318 A. 2d 874 (1974); *see Erdman v. Johnson Brothers,* 260 Md. 190, 195, 271 A. 2d 744 (1970). Appellant concedes that "a warranty [of merchantability under § 2-314] [1] arose in the course of the dealings between the parties," but argues strenuously that appellee failed to present sufficient evidence of a breach.

The essence of appellant's argument, as we understand it, is that appellee failed to prove that he was, at the time of injury, using the clamp "for the ordinary purposes for which such goods are used" within the contemplation of § 2-314. Appellant argues that the "ordinary" purpose of the clamp was not to straighten "unitized" automobile bodies, which it says are actually the equivalent of conventional frames, but to straighten only sheet metal. Appellant fashions its

---

1. In relevant part, Maryland Code (1975), § 2-314 of the Commercial Law Article provides:

"(1) Unless excluded or modified (§ 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .

\* \* \*

"(2) Goods to be merchantable must be at least such as . . . (c) Are fit for the ordinary purposes for which such goods are used[.]

\* \* \*

"(3) Unless excluded or modified (§ 2-316) other implied warranties may arise from course of dealing or usage of trade."

argument by removing from context this testimony given by appellee on cross examination:

"Q. It [the damaged portion] was more than just crumpled sheet metal, basically it was equivalent to a bent frame?

"A. Yes, You might say that. Yes sir."

Otherwise stated, appellant argues that appellee failed to prove that straightening "unitized" bodies was the "ordinary" purpose of the clamp. Rather, appellant continues, since the evidence established that the clamp was fit for its "ordinary" purpose of straightening sheet metal, appellee proved no breach of warranty.

Appellant's argument proceeds from an incorrect premise. First, the short quotation on which it relies does not accurately reflect the thrust of appellee's testimony, which clearly established that the Mustang was not built on a conventional frame, but rather as a "unitized" body composed of sheet metal, and it was that sheet metal to which the clamp was attached. Secondly, the evidence presented by appellee attributed to appellant's salesman the explicit statement that the clamp in question and the two clamps which originally had come with the machine had been manufactured "by the same people"; that the clamp could be used with the Align Rite machine; and that "[the new clamps] were as good as [appellee] had used." Appellant, therefore, completely ignores the fact that its salesman sold the clamps for use with the very machine which it had previously sold to appellee's employer, knowing that both the machine and clamps were to be used by the buyer to straighten "unitized" automobile bodies. Finally, the clamp, which was one of a pair, was delivered in a box that contained no warning of any kind. Consequently, there was ample testimony from which the jury could reasonably find, as it evidently did, that the clamp broke while being used not only for its "ordinary" purpose, but in the precise manner in which appellant had represented it could be used.

At the very least, there was sufficient evidence for the jury to find a breach of implied warranty of

merchantability, namely, that the goods in this instance were not "fit for the ordinary purposes for which such goods are used." Consequently, the trial judge did not err in submitting that issue to the jury.

(3)

In urging that appellee was guilty of contributory negligence as a matter of law, appellant advances a twofold contention. First, it says that appellee, without the benefit of pressure gauges to indicate how much force was being exerted by the alignment machine, applied an excessive amount while nevertheless aware that the clamp was of a more limited capacity than the machine. Secondly, appellant argues that appellee was contributorily negligent "by walking around the right front of the car, directly into the path of the bar which hit him," thereby knowingly exposing himself to the more dangerous of two alternative routes. The first contention is bottomed on appellee's testimony of his awareness that the machine was sufficiently powerful to pull the clamp apart if it was "anchored to a strong enough point." The second prong of the contributory negligence argument rests on the testimony of two witnesses, called by appellee, who were on the scene when the accident occurred. One indicated that it was dangerous to be in the area where the pressure was being applied and the other thought it was a mistake for anyone to walk past the area.

To support his argument that the question of contributory negligence was properly submitted to the jury, appellee cites his own testimony that prior to the accident, he had used the same clamp with the alignment machine for one year under similar circumstances without mishap. Indeed, in his 28 years of experience, he had never seen a clamp fail in this manner. Additionally, he points to the pamphlet furnished with the machine, which illustrates that the foot pedal required to operate the machine was located in the general area in which appellee was standing when he was injured. Not to be overlooked also, appellee maintains, is the assurance received from the salesman that this particular clamp would work with the Align Rite machine.

The U.C.C. is itself silent on the defenses of contributory negligence and assumption of risk in regard to an action for breach of implied warranty. Official Comment 13 to § 2-314, however, does state that:

> "In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained. In such an action an affirmative showing by the seller that the loss resulted from some action or event following his own delivery of the goods can operate as a defense. . . ."

In *Erdman v. Johnson Brothers*, 260 Md. at 197-203, we considered in depth the applicability of contributory negligence and assumption of risk to actions for breach of implied warranty of merchantability under the U.C.C. We concluded there that any attempt to deal with the questions of contributory negligence, assumption of risk, intervening cause and absence of proximate cause in cases of implied warranty was "an exercise in semantics." *Id.* at 200. Illustrative of the misunderstanding which has arisen in the past concerning the applicability of such defenses to warranty cases, as we noted in *Erdman v. Johnson Brothers*, 260 Md. at 198, is the statement by Dean Prosser, who wrote in Prosser, *The Fall of the Citadel*, 50 Minn. L. Rev. 791, 838 (1966), that the warranty cases "are in a state of complete contradiction and confusion as to the defense of contributory negligence."[2] We found it unnecessary, in the

---

2. Courts are almost evenly divided on whether assumption of risk and contributory negligence may be asserted as defenses to actions for breach of implied warranty. Some hold that assumption of risk may be asserted, *see, e.g.*, Robinson v. Williamsen Idaho Equipment Company, 94 Idaho 819, 498 P. 2d 1292, 1301 (1972), while others hold that it may not, *see, e.g.*, Young v. Coca-Cola Bottling Company, 109 R. I. 458, 287 A. 2d 345, 351 (1972). The same division is found where contributory negligence is asserted. *See, e.g.*, West v. Caterpillar Tractor Company, Inc., 336 So. 2d 80, 91-92 (Fla. 1976); Stephan v. Sears, Roebuck & Co., 110 N. H. 248, 266 A. 2d 855, 858 (1970); Ettin v. Ava Truck Leasing, Inc., 53 N. J. 463, 251 A. 2d 278, 281-84 (1969), holding that the defense may be interposed, and Texsun Feed Yards, Inc. v. Ralston Purina Company, 447 F. 2d 660, 668-70 (5th Cir. 1971), holding that it may not. See generally Annot., 4 A.L.R.3d 501 (1965).

final analysis, to decide in *Erdman* whether the precise term to be applied was contributory negligence or assumption of risk, since, in all events, any breach which may have occurred in that case was not the "proximate cause of the loss" within the contemplation of Official Comment 13.

We, too, find it unnecessary here to settle on any precise label, since, even assuming arguendo both defenses are available, appellee was, in our view, guilty of neither contributory negligence nor assumption of risk, as a matter of law. More to the point, there was sufficient evidence for the jury to find that the breach of warranty was the proximate cause of appellee's injuries.

Concededly, our cases do hold generally, as appellant argues, that a person who disdains a safe route for one which he knows to be dangerous is guilty of contributory negligence as a matter of law. *Craig v. Greenbelt Consumer*, 244 Md. 95, 97-98, 222 A. 2d 836 (1966); *Eyler v. Adolph Beauty System*, 238 Md. 227, 229, 208 A. 2d 609 (1965); *Berzups v. H.G. Smithy Co.*, 22 Md. App. 157, 163-65, 321 A. 2d 801, *cert. denied*, 272 Md. 737 (1974). Appellant's reliance on this principle simply overlooks the testimony that appellee was taking the same route which he had walked for one year without mishap, while using the very clamp in question; that because of the assurance received from the salesman and his uneventful experience in the past, appellee was unaware of any danger; and that the pamphlet supplied with the machine depicted as the place of operation the very position in which appellee was located when injured.

A corollary to the principle on which appellant relies is found in *Sanders v. Williams*, 209 Md. 149, 152-53, 120 A. 2d 397 (1956), where contributory negligence was asserted as a defense to a claim for injuries sustained by a service station patron who was struck while walking in front of an automobile which an employee negligently started in motion. In holding there that the trial judge properly refused to submit the issue of contributory negligence to the jury, we said:

"... [O]ne measure of contributory negligence is the need, in a given situation, to anticipate danger.

> Presence or absence of reasonable foresight is an essential part of the concept. One is charged with notice of what a reasonably and ordinarily prudent person would have foreseen and so must foresee what common experience tells may, in all likelihood, occur, and to anticipate and guard against what usually happens. On the other hand, one is not bound to anticipate every possible injury that may occur or every possible eventuality. . . ." *Id.* at 152.

*Accord, Snider v. Senneville,* 267 Md. 552, 558, 298 A. 2d 175 (1973). In terms even more directly related to the case at hand, we said, quoting Dean Prosser, in *Erdman v. Johnson Brothers,* 260 Md. at 198:

> " 'Where the negligence of the plaintiff consists only in failure to discover the danger in the product, or to take precautions against its possible existence, it has uniformly been held that it is not a bar to an action for breach of warranty. . . . But if he discovers the defect or knows the danger arising from it, and proceeds nevertheless deliberately to encounter it by making use of the product, his conduct is the kind of contributory negligence which overlaps assumption of risk; and on either theory his recovery is barred. . . .' "

We cannot say that under the circumstances prevailing here, appellee, as a matter of law, should have anticipated that the clamp would break or, in any event, that he should have guarded against that possibility by taking another route. Nor would reasonable minds agree that he either had discovered the defect or knew the danger arising from it.

We think there was sufficient evidence in this case to support a finding by the jury that appellee exercised reasonable care for his own safety; that he assumed no risk; and that the breach of warranty was the proximate cause of appellee's injuries. In sum, the trial court acted properly in submitting this case to the jury.

*Judgment affirmed; appellant to pay costs.*