FISCHBACH & MOORE INTERNA-
TIONAL CORP. et al.

v.

CRANE BARGE R–14, her engines,
boilers, etc., et al.

In the Matter of the Complaint of M. J.
RUDOLPH CORPORATION as Owners
of the CRANE BARGE R–14, for Exon-
eration from or Limitation of Liability.

In the Matter of the Complaint of the
BAKER–WHITELEY TOWING COM-
PANY, Owner of The TUG HOLLAND
for Exoneration from or Limitation of
Liability.

Civ. A. Nos. Y–77–646, Y–77–1706
and Y–77–1623.

United States District Court,
D. Maryland.

Sept. 10, 1979.

Manfred W. Leckszas, Kieron F. Quinn, William R. Dorsey, III, and James W. Bartlett, III, Baltimore, Md., for intervening plaintiff in Civ. A. No. Y–77–646.

Phillips L. Goldsborough, III, and Jon H. Grube, Baltimore, Md., for Wiley Manufacturing Co.

Joseph M. Mangino, and George F. Chandler, III, New York City, for M. J. Rudolph Stevedoring Corp. and Crane Barge R–14.

Donald A. Krach, Baltimore, Md., for Farrell Lines, Inc.

Edward C. Mackie, and Joseph F. Lavin, Baltimore, Md., for General Electric Co.

Louis G. Close, Jr., Baltimore, Md., and Joseph M. Mangino, New York City, for plaintiffs in Civ. A. No. Y–77–1706.

William R. Dorsey, III, and James W. Bartlett, III, Baltimore, Md., for claimant Chesapeake Operating Company.

Manfred W. Leckszas, and Kieron F. Quinn, Baltimore, Md., for Morrison-Knudsen Co., Inc.

John H. Skeen, Jr., and David W. Skeen, Baltimore, Md., for Baker-Whiteley Towing Co.

John G. Prendergast, Jr., and Jon H. Grube, Baltimore, Md., for Wiley Manufacturing.

Roger L. Smith, Baltimore, Md., for John Giordano.

John H. Skeen, Jr., and David W. Skeen, Baltimore, Md., for plaintiffs in Civ. A. No. Y–77–1623.

Louis G. Close, Jr., Baltimore, Md., and Joseph M. Mangino, New York City, for claimant M. J. Rudolph Corp.

Manfred W. Leckszas, Baltimore, Md., for Morrison-Knudsen Co., Inc., et al.

JOSEPH H. YOUNG, District Judge.

On April 14, 1977, a crane barge partially capsized while lifting an electrical transformer in the Port of Baltimore. In an effort to right the barge and prevent its loss, the crane operator caused one of the transformers to be dropped into the harbor, and two other transformers on the deck of the barge slipped into the water when barge commenced a listing movement.

As a result of this accident, the owners of the transformers, Fischbach and Moore International Corporation and Morrison-Knudsen International Co., Inc., brought suit against various parties involved in some way in this mishap. The owners accordingly brought action *in rem* against Crane Barge R–14, and *in personam* against the owners and manufacturer of the barge, respectively M. J. Rudolph Corporation and Wiley Manufacturing Company. Chesapeake Operating Company, the owner of the pier which was damaged in the accident, intervened as a plaintiff, bringing suit against Crane Barge R–14, Rudolph, and Wiley. Rudolph filed third party claims against the S.S. Austral Pilot, the ship onto which the transformers were to be loaded; the Tug Holland, which was towing the barge crane at the time of the accident; Farrell Lines, Inc., the owner of the Austral Pilot; Baker-Whiteley, the owner of the Tug Holland; and the General Electric Company, manufacturer of the transformers. Each of the parties filed various counterclaims and cross-claims against the other. Out of this tangle of action, counter actions, and cross-actions, the parties have managed to settle all outstanding claims,[1] with the exception of the claims for contribution by Rudolph and Wiley against General Electric.

This matter proceeded to a court trial on July 18, 1979, on the sole issue of General Electric's liability. After hearing testimony and inspecting the crane barge, the Court will find for General Electric on the question of its liability to Wiley and Rudolph for contribution as a concurrent wrongdoer. All findings of fact and conclusions of law are made in accordance with Rule 52(a), F.R.Civ.P., whether or not specifically so stated.

## I. THE FACTS

### A. The General Electric Transformers

General Electric manufactured the three transformers involved in this action for Fischbach and Moore International and Morrison-Knudsen which had formed a joint venture trading as Constructeurs Inga-Shaba (CIS). CIS was involved in constructing a power line in the Republic of Zaire. The transformers were shipped by General Electric from its Pittsfield, Massachusetts plant to the Locust Point Marine Terminal in Baltimore. On the side of each transformer was stencilled a weight figure of "208,000 lbs." This figure was the calculated engineering weight, which was computed from the known weight of the materials which went into fabrication of the transformer. General Electric never physically weighed any of the three units in question.

General Electric listed the figure as the weight of the transformers designated M 100284, M 100285, M 100291, on all invoices, packing lists, and shipping documents. The transformers were shipped by rail from Pittsfield, arriving in Baltimore separately sometime between June and November, 1975. Upon arrival at the Baltimore &

---

1. The parties jointly dismissed the following claims in open court on July 18, 1979:

   1. Fischbach & Moore International's and Morrison-Knudsen's claims against Crane Barge R–14, Rudolph, Wiley, Chesapeake Operating, Farrell Lines, and General Electric;
   2. Chesapeake Operating's claims against Crane Barge R–14, Rudolph, and Wiley;
   3. Wiley's claims against Crane Barge R–14 and Rudolph, Chesapeake Operating, Austral Pilot, Tug Holland, Farrell Lines, and Baker-Whiteley;

   4. Crane Barge R–14's and Rudolph's claims against Fischbach & Moore International and Morris-Knudsen, trading as CIS, and Chesapeake Operating;
   5. Rudolph's claims against the Austral Pilot, Farrell Lines, and Baker-Whiteley; and
   6. Farrell Lines' claims against Wiley, Rudolph, Chesapeake Operating, General Electric, Baker-Whiteley, Fischbach and Moore International and Morrison-Knudsen, trading as CIS.

Ohio Yard, Locust Point Marine Terminal rail express, each transformer was transported to Pier 8.

On July 11, 1976, nine months before the accident, another of General Electric's transformers listed at a weight of 80 tons was lifted by the barge crane Cape Fear, which was fitted with a device enabling it to weigh the lifted cargo. The device indicated the actual weight of this transformer as 110 tons. On July 23, 1976, a transformer of the type involved in this action, stencilled at 104 tons, was determined to weigh between 119 to 122 tons.

Prior to the second weighing by the Cape Fear, the Chesapeake Operating Company notified Morrison-Knudsen of a possible discrepancy between the actual and stencilled weights of the General Electric transformers. As a result of this notification, a representative of Morrison-Knudsen contacted James Seahill, of the International Sales Division of General Electric, who explained how the stencilled figure had been computed. Seahill further indicated that while the units could be overweight by as much as five percent, General Electric had confidence in the figures and would stand on them.

As a result of various inquiries concerning the weight of the transformers, General Electric rechecked the stencilled figures, reviewed the calculations for the weight of the similar transformers, and arranged to have one of its converter transformers[2] weighed by the Penn Central Transportation Company. On August 27, 1976, transformer M 100301 was placed on a railcar which was weighed empty and full in Pittsfield, Massachusetts. The difference between the two weighings, representing the actual weight of the transformer, was 213,400 pounds, or less than 107 tons.

### B. Crane Barge R–14

With Rudolph's assistance, Wiley completed conversion of a 60 ton floating crane, acquired from the Navy, to a R–14 crane

barge. As designed and manufactured, the R–14 had a maximum non-revolving lift of 130 tons over the stern of the barge and up to 115 tons full revolving at maximum outreach of 40 feet. At an outreach of 45 feet, the R–14 had a lifting capacity of 104 tons.

The R–14 was not outfitted with any weight-indicating device, as was the Cape Fear. However, the crane operator could safely lift loads without endangering the stability of the barge in the water by relying on an outreach indicator which was used in conjunction with a chart in the crane cab which listed the crane's lifting capacity at various levels of outreach. Such a procedure required accurate information on the weight of the load to be lifted.

### C. The Accident

On April 13, 1977, Rudolph was engaged to load five General Electric transformers abroad the S.S. Austral Pilot. Among these five transformers was the unit which had been weighed by General Electric the previous August. This loading operation involved carrying the transformers from their storage point at Pier 8 to Pier 3, where the Austral Pilot was docked.

Transfer of the five transformers from Pier 8 to Pier 3 occurred without incident on the morning of April 14, 1977. During this operation, the transformers had been transported in two trips of the crane barge from Pier 8 to Pier 3, in which three and two transformers respectively were carried on each trip. On each transfer, two transformers were carried on the deck of the barge, and when the need arose to carry a third unit, it was carried suspended by the crane, directly over the two units on the barge deck.

Once the five units had been carried to Pier 8, procedures were undertaken to carry the units aboard the Austral Pilot. Crane operator John Giordano had already loaded two units on the deck of the crane barge

2. This transformer, M 100301, was not only identical to the transformers damaged as a result of the instant casualty, it was also among the five units which the crane barge was in the process of loading when the accident occurred.

when he was told by Chesapeake's gear man that "they" wanted three transformers carried on the first trip to the ship. Giordano instructed the tug to move the crane barge back to its loading position and proceeded to lift the third transformer. Giordano indicates that he was aware of the weight stencilled on the side of the transformers and relied upon this figure in lifting the unit. The transformer was lifted at an outreach of 40 to 45 feet. When Giordano was in the process of completing his swing of the crane boom and the suspended cargo into position, the barge listed radically causing Giordano to drop the suspended transformer into the harbor and the two units on the deck to slide into the water.

After the units were recovered two weeks later, several of the transformers were weighed. In separate weighings by various parties, the weights of transformer M 100284, the unit suspended on the crane's hook at the time of the casualty was determined to be:

   (1) 113.2, 113.4, and 113.4 tons (by Richard Dudgeon, Inc., April 25, 1977);
   (2) 109.6 tons (by B&O at Locust Point, July 9, 1977);
   (3) 109.3 tons (by Con Rail at North Adams Junction, July 22, 1977); and
   (4) 110 tons (by General Electric at its Pittsfield Plant, August 3, 1977).

Subsequent weighings showed the weight of transformer M 100291, one of the units on the deck, to be:

   (1) 107.0, 107.2, 113.7, 113.3 tons (by Richard Dudgeon, Inc., April 25, 1977);
   (2) 108.9 tons (by B&O at Locust Point, July 9, 1977);
   (3) 108.6 tons (by Con Rail at North Adams Junction, July 22, 1977); and
   (4) 108.5 tons (by General Electric at its Pittsfield Plant, August 3, 1977).

## II. THE CLAIMS OF WILEY AND RUDOLPH

Wiley and Rudolph have admitted liability for the collapse of the R–14 and settled claims which had been brought against them. They now seek contribution from General Electric for any liability which it might share in causing the casualty.

Wiley and Rudolph premise General Electric's liability on three theories, i. e., strict liability, breach of warranty, and negligence. They contend that as manufacturer of the transformers, General Electric had a duty to warn of latent, dangerous conditions which were known or should have been known to the manufacturer. See Restatement (Second) of Torts, § 388, comment g, at 304 (1965); Moran v. Faberge, 273 Md. 538, 543–44, 332 A.2d 11 (1975). In this instance, it is argued that General Electric had a duty to exercise reasonable care in labeling the weight of the transformers. Wiley and Rudolph further allege General Electric knew that the weight information was inaccurate and that the transformers would have to be transferred between carriers by the use of heavy-lift equipment. They maintain that General Electric should have known that accurate weight information was critical to the safe operation of such lifting equipment, and that it breached its duty of reasonable care when it stencilled inaccurate weight information without an appropriate warning as to the precise nature of this information.

Wiley and Rudolph contend that by selling the transformers with the weight of the unit inaccurately stencilled on the side, the transformers were rendered "defective" under sections 402A and 402B of the Restatement (Second). Wiley and Rudolph insist that the weight of the transformers is a latent, dangerous condition, which, having rendered the transformers "unreasonably dangerous and defective," subjects General Electric, to strict liability for any proximately resulting loss.

Finally, Wiley and Rudolph assert that General Electric breached express and implied warranties concerning the weight of the transformers, and maintain that since the actual weight of the transformers did not conform to the stencilled information, and as this breach of warranty was a proximate cause of the accident, General Electric is liable for contribution.

## III. FINDINGS AND CONCLUSIONS

■ Under maritime law, a right of contribution exists among wrongdoers concurrently liable for a given loss. *See Edmonds v. Compagnie Generale Transatlantique,* —— U.S. —— n. 30, 99 S.Ct. 2762, 61 L.Ed.2d 521 (1979); *Cooper Stevedoring Co. v. Kopke, Inc.,* 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974). Where two or more wrongdoers are concurrently liable for a party's injury, admiralty jurisprudence allows allocation of the loss among the parties substantially causing the injury. *See Edmonds v. Compagnie Generale Transatlantique,* —— U.S. at ——, n. 30, 99 S.Ct. at 2762.

■ In principle, a right of contribution rests upon the common liability of the wrongdoers for the loss notwithstanding the fact that the liability of each wrongdoer may rest on a different ground. *See Guillard v. Niagara Machine & Tool Works,* 488 F.2d 20, 22–23 (8th Cir. 1973); *City of Kingsport, Tenn. v. SCM Corp.,* 429 F.Supp. 96, 100 (E.D.Tenn.1976). However, any entitlement to contribution which a concurrent wrongdoer may have from another culpable party arises from the duty each of the wrongdoers owes to the injured party, as opposed to an obligation running among themselves. *See generally Guillard v. Niagara Machine & Tool Works,* 488 F.2d at 22; *City of Kingsport, Tenn. v. SCM Corp.,* 429 F.Supp. at 100.

In the present action, Wiley and Rudolph seek contribution from General Electric on the basis of the latter's asserted liability to Fischbach & Moore International and to Morrison-Knudsen for breach of warranty, strict liability, and negligence. On the basis of the facts established at trial, the Court concludes that this is a case sounding exclusively in negligence, warranty theory and strict liability having no application. The Court further finds that General Electric breached no duty of care relating to the reported weight information, notwithstanding the probable inaccuracy of the figures.

### A. Breach of Warranty

Any contribution to which either Wiley or Rudolph may be entitled from General Electric must rest upon the breach of warranties existing between the plaintiffs in this action and General Electric. Any right of recovery which Wiley or Rudolph may have is plainly derivative of any liability which General Electric may have to the plaintiffs.

■ In an action for breach of warranty, a plaintiff must show that a warranty existed, that the goods delivered did not conform to the warranty, and that the breach of the warranty provisions proximately caused the harm. *Mattos, Inc. v. Hash,* 279 Md. 371, 368 A.2d 993 (1977). Further, recovery for breach of warranty will not be permitted unless the facts also indicate that prior to the injury sustained, the buyer of the goods had no actual knowledge of their non-conformity as would negate his reliance on the original representation of the warranty. *See Erdman v. Johnson Brothers,* 260 Md. 190, 203, 271 A.2d 744 (1970).

■ The record reflects no warranty between plaintiffs and General Electric relating to the weight of the transformers other than that which may have arisen as a result of the stencilling by General Electric of weight information on the side of the various units. Where an affirmation of fact is made on a product or its container, an implied warranty arises that the product will conform to the representations. Ann.Code of Md., Commercial Law Art., § 2–314(2)(f). Consequently, by indicating on the transformers that each unit weighed 104 tons, General Electric thus warranted the accuracy of the figures, at least within the degree accepted within the industry.

Notwithstanding the existence of the warranty between General Electric and plaintiffs, the breach of that warranty does not subject General Electric to liability. The plaintiffs were aware that the units may have been heavier than the stencilled weight figures reflected. In July, 1976, Morrison-Knudsen was informed of two

weighings by the Cape Fear which showed them to be substantially heavier than their reported weight. On the basis of this information, Morrison-Knudsen notified General Electric of this possible discrepancy between the reported and actual weight of the transformers. A General Electric sales representative explained that the stencilled information did not reflect "actual" weight but was a calculated figure based upon the weight of the materials used to construct each unit. Although General Electric expressed its confidence that the stencilled figures were accurate, it cautioned that the units could exceed the stencilled figure by as much as 5 percent.

One month after this exchange of information, General Electric mailed to Morrison-Knudsen an invoice for transformer M 100301, one of the five transformers which the R–14 was to load aboard the Austral Pilot. This invoice contains certain handwritten notations which indicate that the weight stencilled on the unit was an estimated figure, that actual weight of the unit would be determined by the railroad, and that this information would be forthcoming. The invoice also reflects a notation which corresponds to the number of the railroad weight ticket reporting the actual weight of the unit, "P.C. 766052," and the unit's determined weight, "213,000 [pounds]."

■ This evidence establishes not only that Morrison-Knudsen was aware that the stencilled figures on each unit may have understated its actual weight, but that General Electric had provided plaintiffs specific information showing the actual weight of one of the converter units, identical to those subsequently damaged, to exceed its stencilled weight by 3 tons. The record does not indicate that Morrison-Knudsen ever relayed any of this information to parties engaged in shipping and loading the unit. As the Court is satisfied that plaintiffs either had actual knowledge of a discrepancy between the actual and stencilled weight of the transformers, or at least "knowledge of facts which were so obvious that [they] must have known of [the non-conformity]," *Erdman v. Johnson Brothers*, 260 Md. at 196–97, 271 A.2d at 747, the implied warranty respecting the weight of the units was no longer applicable to plaintiffs as a basis for proceeding against General Electric on grounds of its breach. *See, e. g., Erdman v. Johnson Brothers, supra.* Accordingly, since General Electric has no liability to plaintiffs in this action for breach of warranty, neither Wiley nor Rudolph is entitled to contribution from General Electric on this ground. *See Guillard v. Niagara Machine & Tool Works*, 488 F.2d at 22.

■ Further, neither Wiley nor Rudolph can recover directly on the warranty between General Electric and plaintiffs as third party beneficiaries. Under § 2–318 of the Commercial Law Article, "[a] seller's warranty whether express or implied extends to any natural person who is . . [an] ultimate consumer or user of the goods or person affected thereby . . . and who is injured . . . by breach of the warranty." Relief under this provision is plainly not available to corporate entities such as those involved in this action which are incapable of incurring the loss for which this provision narrowly provides relief. Thus, Wiley and Rudolph, as third party beneficiaries, have no rights under the warranty to recover a strictly pecuniary loss.

### B. Strict Liability

In *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976), the Maryland Court of Appeals adopted the theory of strict liability as expressed in § 402A of the *Restatement (Second) of Torts*. This provision provides as follows:

§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Without question, the parties' reliance on strict liability in the present circumstances carries this theory of recovery up to and beyond the limits of its proper application. This is not a case involving a "defective" product within the meaning of § 402A. The loss sustained was entirely unrelated to the functioning of the transformers as electrical equipment, but rather arose from their conveyance as simple cargo. Moreover, the record establishes no liability on the part of General Electric for anything other than the possible mislabeling of transformers as to their weight and the *Restatement* distinguishes between "defective" goods and mislabeled goods by treating the latter specifically under a separate provision, § 402B.

This provision reads as follows:

§ 402B. Misrepresentation by Seller of Chattels to Consumer

One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though

(a) it is not made fraudulently or negligently, and

(b) the consumer has not bought the chattel from or entered into any contractual relation with the seller.

In contrast to § 402A, which provides for relief from personal injury and damage to the property of the aggrieved user of a "defective" product, § 402B limits recovery for mislabeled goods to damages for "physical harm" to the user. Accordingly, unless this distinction is to be rendered meaningless, the Court must reject the exceedingly broad assertion of Wiley and Rudolph that the mislabeling of the transformers rendered them defective.

The comment to § 402B indicates that the *Restatement (Second)* provides a parallel rule as to strict liability for a "pecuniary loss" resulting from a seller's misrepresentation which is stated in § 552C. This rule provides:

§ 552C. Misrepresentation in Sale, Rental or Exchange Transaction

(1) One who, in a sale, rental or exchange transaction with another, makes a misrepresentation of a material fact for the purpose of inducing the other to act or to refrain from acting in reliance upon it, is subject to liability to the other for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation, even though it is not made fraudulently or negligently.

■ This case involves the pecuniary loss resulting from General Electric's alleged mislabeling. While the *Restatement (Second)* subjects a seller to strict liability for pecuniary loss resulting from seller's misrepresentation "[t]he fact misrepresented must be one that is material to the transaction and of sufficient consequence to justify reliance upon it is entering into the transaction." *Restatement (Second) of Torts*, § 552C, comment e, at 144. As the allegedly inaccurate weight information reported by General Electric was not material to the sale of transformers to plaintiffs, it consequently cannot be found liable under strict liability theory for losses purportedly resulting from the alleged inaccuracy of the information provided. Again, absent General Electric's strict liability to plaintiffs for the damaged transformers in question, neither Wiley nor Rudolph has a right of contribution against General Electric without proof of negligence.

### C. Negligence

■ Although General Electric was under no affirmative duty to place any information on the transformers as to weight, once it undertook to stencil such informa-

tion on each unit, it assumed a duty to exercise reasonable care to assure that the stencilled information was accurate. *See Arnold's Hofbrau, Inc. v. George Hyman Const. Co., Inc.*, 156 U.S.App.D.C. 253, 480 F.2d 1145 (D.C.Cir. 1973); *Stauffer Chemical Co. v. Brunson*, 380 F.2d 174 (5th Cir. 1967); *Blessing v. United States*, 447 F.Supp. 1160 (E.D.Pa.1978); *Pennsylvania R. Co. v. Yingling*, 148 Md. 169, 129 A. 36 (1925); *Cutlip v. Lucky Stores, Inc.*, 22 Md. App. 673, 325 A.2d 918 (1974), *cert. denied*, 273 Md. 719 (1974). Thus, the question presented is not whether the information which General Electric provided was in fact inaccurate, but whether the alleged inaccuracy of the weight information available prior to the casualty was a result of General Electric's failure to exercise reasonable care.

No evidence presented indicates that the transformers in question actually weighed the stencilled figure of 208,000 pounds. However, prior to the casualty, Morrison-Knudsen was notified of the possible inaccuracy of the stencilled figures, and it subsequently made inquiries of General Electric concerning this problem. Not only did General Electric explain to Morrison-Knudsen how the stencilled figures were ascertained, but it also noted that the actual weight of the transformers could exceed the stencilled figures by 5 percent. Further, General Electric arranged to weigh one of the transformers which Morrison-Knudsen had ordered to check the accuracy of the figures. As a result of this weighing the weight of the transformers was determined to be 213,400 pounds, three percent in excess of the stencilled figures. The evidence also indicates that General Electric conveyed this information to Morrison-Knudsen.

■ On balance, the record reflects no circumstance establishing the negligence of General Electric. No evidence persuasively indicates that it negligently performed the calculation upon which the weight originally stencilled on the transformers was based. Moreover, the Court cannot find that General Electric acted in other than a prudent,

reasonable manner in rechecking the accuracy of the stencilled figures once it had been notified of a possible discrepancy. The re-weighing showed the weight of the transformers to be well within the 5 percent tolerance consistent with General Electric's earlier assurance to Morrison-Knudsen. Thus, the Court is satisfied that if the transformers weighed significantly in excess of the reported figures—and the record indicates that the weight of the transformers was more than 5 percent above the stencilled weight—this discrepancy was not necessarily detectable by General Electric through the exercise of reasonable care.

As General Electric breached no duty of care in stencilling weight information which was shown to be inaccurate only after the accident involved in the present case, it is not subject to negligence liability for the loss. Accordingly, no liability exists between General Electric and plaintiffs which would provide Wiley or Rudolph a basis for asserting a right of contribution against General Electric.

## IV. CONCLUSIONS

■ The circumstances of this case properly presents a question of General Electric's negligence. Breach of warranty and strict liability are inappropriate as possible theories of recovery given the evidence of plaintiffs' knowledge of the inaccuracy of the stencilled weight figures and the pecuniary nature of the loss sustained. However, implicit in a negligence theory is the principle that those who sustain a loss will bear it, unless the loss results from the fault of another. Absent proof of another's negligence, courts will not shift responsibility for the loss from the injured party. In cases of unavoidable accident, the law provides no relief to the injured party. *See* Prosser, *Torts*, § 29 (4th Ed. 1971), at 140.

Although the Court is satisfied that the discrepancy between the reported and actual weights of the transformers contributed substantially to the accident in which the three units were damaged, the Court concludes that this discrepancy is not attributable to any negligence on the part of General Electric, and judgment will be entered in its favor.

Accordingly, it is this 10th day of September, 1979, by the United States District Court for the District of Maryland, ORDERED:

1. That judgment in this action be, and the same is, hereby entered in favor of General Electric Company against Cross-Claim Plaintiff Wiley Manufacturing Company and Third Party Plaintiff M. J. Rudolph Stevedoring Corporation.

2. That court costs be, and the same are, hereby assessed against Wiley Manufacturing Company and M. J. Rudolph Stevedoring Corporation.