632 F.2d 1123
 29 UCC Rep.Serv. 1165
 FISCHBACH & MOORE INTERNATIONAL CORP. and Morrison-Knudsen
International Co., Inc. t/a Constructeurs
Inga-Shaba, Plaintiffs,
and
Chesapeake Operating Co., Intervening Plaintiff,
v.
CRANE BARGE R-14, her engines, boilers, etc.; N. H. Rudolph
Stevedoring Corp., Defendants. (Two Cases)
and
WILEY MANUFACTURING COMPANY OF PORT DEPOSIT, MARYLAND, a
Unit of Equipment Systems Division of AMCA
International Corp., Appellant,
v.
S. S. AUSTRAL PILOT, her engines, boilers, etc., in rem and
Tug Holland, her engines, boilers, etc., in rem and Farrell
Lines, Inc., in personam and The Baker-Whiteley Towing Co.,
Third-Party Defendants,
and
General Electric Company, Appellee. (Two Cases)
 Nos. 79-1675, 79-1676.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 3, 1980.
Decided Sept. 26, 1980.
 
 Jon H. Grube, Baltimore, Md. (Phillips L. Goldsborough, III, Smith, Somerville & Chase, Baltimore, Md., on brief), for appellant Wiley Manufacturing Co.
 Joseph M. Mangino, New York City (George F. Chandler, III, Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, on brief), for appellant M. J. Rudolph Corp.
 Edward C. Mackie, Joseph F. Lavin, Baltimore, Md. (Robert W. Fox, Rollins, Smalkin, Weston, Richards & Mackie, Baltimore, Md., on brief), for appellee.
 Before BRYAN, Senior Circuit Judge, and RUSSELL and SPROUSE, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 Wiley Manufacturing Company (Wiley) and M. J. Rudolph Stevedoring Corporation (Rudolph) appeal the district court's judgment in favor of General Electric Company (GE) after a trial without a jury. There were numerous parties plaintiff and other defendants in the original actions. All of the claims were settled prior to trial except the claims of Wiley and Rudolph against GE for contribution to the settlements. The principal issues all involve GE's acts in understating the weights of large transformers.
 
 
 2
 The original plaintiffs were Fischback and Moore International Corp. and Morrison-Knudsen International Co., Inc., a joint venture (hereafter Morrison-Knudsen). Morrison-Knudsen was constructing a power facility in the Republic of Zaire. GE, on Morrison-Knudsen order, manufactured transformers including the three involved in this action. GE had stencilled a figure indicating a weight of "208,000 lbs." on the side of each transformer.
 
 
 3
 Wiley had reconstructed a former Navy floating crane for Rudolph. The crane on the barge had the capacity to lift a maximum of 230,000 pounds revolving fully at a radius or "outreach" of 40 feet. As the outreach was extended, the loading capacity was reduced. Neither the barge nor the crane had a weight-indicating device whereby the operator of the crane would know when it reached or exceeded its capacity. The cab of the crane did have a chart, however, which listed the crane's lifting capacity at various levels of outreach; therefore the crane operator could safely lift loads by checking the outreach indicator if he had accurate information on the weight to be lifted.
 
 
 4
 Morrison-Knudsen arranged for Rudolph to transfer transformers from the pier to the transporting ships on April 14, 1977. After lifting two transformers from the pier and placing them on the barge deck, the crane operator then loaded a third transformer. He swung it with the crane over the stern "just over 90 degrees to port." The outreach exceeded the rated capacity for the actual weight of the transformer being lifted, which was approximately 5% more than the 208,000 pounds indicated.
 
 
 5
 The lifting and swinging of the third transformer caused the barge to list. Its deck was thus partially submerged. This, in turn, caused the two transformers on the deck to plunge into the harbor. The crane operator released the brakes on his lifting cable, permitting the transformer on the hook to drop into the water. The barge, in turn, violently righted itself and, in addition to dropping the transformer into the water, caused damage to other property not involved in this appeal.
 
 
 6
 Rudolph admitted that its negligence proximately contributed to the accident, and Wiley admitted that its negligence in design of the crane barge proximately contributed to the accident. (The barge had an inadequate reserve stability with heavy deck loads.) Expert testimony established, however, that the barge would not have capsized had the correct weight of the transformers been indicated to the barge operator.
 
 
 7
 Wiley and Rudolph contend GE is liable for contribution on theories of warranty, strict liability in tort, and negligence. The district court ruled that GE was not liable for contribution to them on any theory. We agree and affirm.
 
 
 8
 There is no disagreement as to the right of contribution among concurrent wrongdoers under both maritime and Maryland law. Cooper Stevedoring Co., Inc. v. Fritz Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974); Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 260 n. 8, 271 n. 30, 99 S.Ct. 2757 n. 8, 2762 n. 10, 61 L.Ed.2d 521, 527 n. 8, 534 n. 30 (1979); Maryland v. Capital Airlines, Inc., 267 F.Supp. 298 (D.Md.1967). Such contribution, however, must arise from the duty each of the wrongdoers owes to the injured party and not from any obligation among themselves. Guillard v. Niagara Machine & Tool Works, 488 F.2d 20, 22-23 (8th Cir. 1973). The issue, then, is not whether GE breached its duties to Wiley or Rudolph but whether GE breached its duties to Morrison-Knudsen.[1]
 
 
 9
 In a warranty action, a plaintiff must show that a warranty existed, that the product did not conform to the warranty, and that the breach proximately caused the injury or damage. Mattos, Inc. v. Hash, 279 Md. 371, 368 A.2d 993 (1977). Recovery in warranty, moreover, will not be permitted if the buyer of the goods had actual knowledge of their nonconformity. The same rule applies if the buyer had knowledge of facts which were so obvious that the nonconformity must have been known.
 
 
 10
 The GE purchase order contains the following warranty:
 
 
 11
 Seller warrants that products manufactured by Seller, including such parts manufactured by others as are integral therewith, shall be in complete compliance with the specifications and shall be free from defects in material and workmanship.
 
 
 12
 The specifications called for a shipping weight of 208,000 pounds: the invoice for the transformer on the hook indicated a weight of 208,000 pounds, the bills of lading prepared by GE for shipment to Baltimore described the transformers as weighing 208,000 pounds, and the notation "208,000 lbs." was stencilled on the side of each transformer.
 
 
 13
 It is not necessary to determine whether these statements amount to an express warranty or whether there was an implied warranty (despite GE's express disclaimer of an implied warranty in the warranty document). The trial court assumed there was both an express and implied warranty, but held that any warranty breach was not the proximate cause of the accident. It found that Morrison-Knudsen was aware of the weight discriminations, and never relayed this information to any of the parties involved in shipping and loading the units.[2] Since the information was known by Morrison-Knudsen as well as by GE, and since Morrison-Knudsen continued to act notwithstanding its knowledge of the correct information, it would be barred from any action against GE for breach of the warranty. Erdman v. Johnson Brothers Radio and Television Co., Inc., 260 Md. 190, 271 A.2d 744 (1970). Since contribution to Wiley and Rudolph depends on the validity of Morrison-Knudsen's claim, their actions are likewise barred.
 
 
 14
 Wiley and Rudolph's next contention is that GE is liable to them for contribution on the basis of strict liability in tort. They contend that had the operator of Rudolph's crane been aware of the correct weight, the accident would not have happened. They apparently do not contend that the weight of the transformers made them unreasonably dangerous, but that GE's failure to warn of the discrepancy between the stencilled weight and the actual weight made them dangerous products.
 
 
 15
 Section 402A of the Restatement (Second) of Torts (1965), describing a seller's strict liability in tort, has been adopted in principle by the Supreme Court of Maryland in Phipps v. General Motors Corp., 278 Md. 337, 363 A.2d 955 (1976). It provides in part:
 
 
 16
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if . . . .
 
 
 17
 The trial court held that GE did not ship the transformer in a defective condition because the transformers as electrical equipment were not functionally defective. It held that any loss arose from their conveyance as simple cargo. We do not agree with the implication that a product defective only for transportation purposes can never be defective within the Maryland theory of strict liability in tort. The trial court was correct, however, in holding under the circumstances of this case, that the transformer was not in a defective condition.
 
 
 18
 The trial court found that the three transformers on the barge at the time it capsized weighed 5 percent more than the weight stated. Experts on the loading of heavy products testified that many products arrive at piers containing erroneous weight information on their packing materials. One of Rudolph's experts testified that "particularly in regard to electrical machinery, it has been my experience that you sometimes have to look at the marked weight with a grain of salt." There was some conflict in the testimony concerning the frequencies of this mislabeling. The fact, however, that it occurs with sufficient frequency to be noted by experts in charge of pier activity is probative. It casts considerable doubt on the assumption that mislabeling the weight of a 208,000 pound product by 5 percent makes it unreasonably dangerous. Thus, Wiley and Rudolph failed to establish GE's strict liability in tort.
 
 
 19
 The trial court also held that GE was not liable under the theory of mislabeling of products as expressed in § 402B of the Restatement (Second) of Torts. Again, we agree. The damage here was to Morrison-Knudsen's transformers and to Rudolph's barge and crane. Section 402B, in contrast to § 402A, provides liability for misrepresentation of a material fact by a seller for physical harm to the consumer, not for property damage.
 
 
 20
 Wiley and Rudolph assert finally that GE is liable to them for contribution on the basis of its negligence in failing to warn of the latent, dangerous condition of the transformers. A manufacturer generally not only has a duty to exercise reasonable care in the design and manufacture of his product, but must exercise reasonable care to warn of latent, dangerous conditions. Moran v. FabergEe, Inc., 273 Md. 538, 543-44, 332 A.2d 11 (1975); Restatement (Second) of Torts § 388, (1965); W. Prosser, Law of Torts § 96 (4th ed. 1971).
 
 
 21
 The weights stencilled by GE on the transformers were not determined from weighing. It did not have available at its Massachusetts manufacturing plant the equipment to physically weigh the transformers. It calculated the total from the component weights of the materials used in constructing the transformers. After being advised on two occasions in July, 1976 that the stencilled weights were erroneous, GE rechecked the weight of a prototype transformer and found it to weigh three tons more than that indicated by the stencilling. GE then caused another transformer to be weighed by its railroad shipper, which also showed a discrepancy in weight. GE advised its buyer, Morrison-Knudsen, of the discrepancies and cautioned the actual weight of the transformers could exceed the stencilled figures by 5 percent.
 
 
 22
 The transformers were recovered from the water after the accident and weighed. The trial court found their weight to be within the 5 percent tolerance of which GE had advised Morrison-Knudsen.[3] The trial court further found that GE was not negligent in calculating the stencilled weights and concluded that GE had acted in a prudent, reasonable manner in checking the accuracy of the stencilled figures once it was notified of discrepancies.
 
 
 23
 These facts found by the trial court demonstrate that Wiley and Rudolph did not sustain their burden of proving that GE failed to exercise reasonable care, and since, as we have indicated, it is not liable in warranty or strict liability in tort, the district court was correct in entering judgment in favor of GE. The judgment is, therefore, affirmed.
 
 
 24
 AFFIRMED.
 
 
 
 [1]
 Wiley's claim for contribution includes damages paid by Wiley to Rudolph. Rudolph also alleges a direct claim against GE for damages to the barge. GE's duty to Rudolph must be demonstrated to sustain those claims, and our disposition of the issues negates such a duty
 
 
 [2]
 GE had been advised by other companies handling GE produced transformers of serious discrepancies between the actual and stencilled weight of those transformers some nine months prior to the accident. At about that same time, the company which operated the pier where the accident occurred, notified Morrison-Knudsen of a possible discrepancy between the actual and stencilled weight of the transformers. Morrison-Knudsen contacted an official of GE's sales department who explained that GE had arrived at the weight of 208,000 pounds by adding the weights of all the component parts and materials that went into the transformers. This official also advised Morrison-Knudsen that the transformers could weigh as much as 5 percent more than the 208,000 pounds indicated by the stencilling. One month after this exchange of information, GE mailed to Morrison-Knudsen an invoice containing a handwritten notation that the weight stencilled on the unit was an estimated figure and that the actual weight would be determined by the railroad. There was also a notation indicating the actual weight of one unit as being 213,000 pounds rather than 208,000 pounds. Morrison-Knudsen did not relay this information to Rudolph, the operator of the crane barge, or the owner and operator of the other pier facilities
 
 
 [3]
 The transformer which had been suspended on the crane's hook was weighed by the various parties who each reported a different weight as follows: 113.4 tons; 109.6 tons; 109.3 tons; and 110 tons. One of the transformers which had been on the deck was weighed by the same parties also reporting varying results as follows: 107.2 tons; 113.7 tons; 108.9 tons; 108.6 tons; and 108.5 tons