**In re MORWELD STEEL PRODUCTS CORPORATION, a Michigan Corporation, Debtor.**

**Bankruptcy No. NG 75–260 B7.**

United States Bankruptcy Court, W. D. Michigan.

Feb. 11, 1981.

Running, Wise & Wilson, Richard W. Ford, Traverse City, for claimant.

Hertzberg, Jacob & Weingarten, P. C., Dennis Kayes, Detroit, for debtor.

## NOTICE OF DEFECTS UNDER U. C. C.—SUMMARY JUDGMENT

DAVID E. NIMS, Jr., Bankruptcy Judge.

Morweld Steel Products Corporation (hereafter Morweld) moves for partial summary judgment against Univox of California, Inc., (which was a partnership, Univox California Co., when this litigation began) in the course of proceedings to determine the indebtedness of either party to the other.

The facts are complicated, involving proceedings in both this court and the Circuit Court for the County of Antrim, Michigan. Unlike most summary judgment proceedings, the court has voluminous files available not only consisting of the "pleadings" but also depositions, interrogatories, documents, etc. and the full transcript of the Antrim County Court trial.

## FACTS

After sifting through vast amounts of available material, the court makes findings of material facts, keeping always in mind that Univox has a right to a full trial unless the court is satisfied that such a trial would add nothing to the proper disposition of this case.

In February, 1974, Univox was awarded a contract to manufacture a "cable assembly" for the U. S. Army. Univox then found that Morweld was the only supplier of a certain type of a reel which was a major part of the "cable assembly." The Army contract with Univox specified that Morweld would manufacture the reels and it set forth drawings and specifications for these reels. These reels were to be sent by Morweld, located at Ellsworth, Michigan, to Essex Cable Manufacturing, Inc., in Chicago, Illinois, which would install the cable and then ship to Los Angeles, California, the location of Univox. On May 15, 1974, a purchase order for 6710 reels was sent to Morweld. The final price agreed upon after some problems and negotiations was $31.50 per reel. Maurice M. Taylor, president of Morweld, and hereafter referred to as Taylor, called Univox and stated there had been an equipment breakdown and Morweld needed money to remedy the situation immediately. Univox refused to make a loan to Morweld but agreed to loan $50,000.00 to Taylor and his wife with certain real property owned by them as collateral. This was a three month mortgage bearing interest of 10% after the due date. Maurice M. and Madeline R. Taylor were the sole stockholders and officers of Morweld. As an inducement for the loan, Morweld agreed to reduce its charge for a unit price to $30.50 or a $6,710.00 reduction over all. The mortgage was not timely paid, whereupon it was agreed that Morweld would grant a credit of $5.92 on each reel. This was done.

There was present at the Morweld plant an employee of the government who was to inspect the reels before they were shipped to Essex and each shipping document bore a stamp that was signed by the inspector which stated that all items conformed to the contract. However, a deposition of the inspector indicated that the inspection was in many instances superficial. Although Univox does make the claim that Morweld falsified inspection reports to it, in its negotiations with the Army, it stated that it relied on the above inspections. It also claimed that no funds for inspections were allowed in the contract. Univox claims that Morweld knew that contract specifications were not met and for the purpose of this hearing I will assume this to be true.

On July 22, 1975, Univox received a telegram from the government contracting officer notifying it that some reels failed to meet certain tests and that this "cast great doubt on acceptability of reels" produced by Morweld. The Army eventually rejected the reels, then accepted them at a reduced

price as "non-conforming" after negotiations with Univox.

On December 1, 1975, an employee of the U. S. Army was at the Ellsworth plant of Morweld and, at that time, Maurice Taylor asked him "what's this he (Taylor) hears about failures of the 453**." The Army told Taylor of the defects. No notice was given by Univox of the defects nor was Morweld at any time invited to participate in the renegotiations between Univox and the Army.

### CHAPTER XI ARRANGEMENT PROCEEDINGS

On February 12, 1975, Morweld filed a petition for an arrangement under Chapter XI in the United States District Court for the Western District of Michigan. By order dated February 13, 1975, that court authorized the debtor to operate under the control of the court as a debtor in possession. On March 20th a creditors committee was appointed and a Plan of arrangement was filed on May 5, 1975. A plan was accepted by the creditors in June and an order was entered confirming the plan on August 20, 1975. Notice of confirmation was served August 26, 1975, and on August 27th the United States filed a notice of appeal to the U. S. District Judges.

Under the plan as confirmed, payment to creditors was to be by a set schedule. The court was to retain jurisdiction over Morweld until all controversies and disputes involving creditors of the debtor and claims filed or affected by the proceedings were resolved.

On September 9, 1976, the order of the bankruptcy judge confirming the plan was affirmed by the Hon. Noel P. Fox, Chief Judge of the District Court. On November 5, 1976, the decision of Judge Fox was appealed to the Court of Appeals. July 6, 1977, a petition for adjudication of Morweld was filed because the payments called for under the plan were not being made. On August 2, 1977, an order was entered adjudicating Morweld a bankrupt and a trustee in bankruptcy was appointed. The trustee qualified by filing his bond on August 4, and on August 15, a motion for a rehearing was filed. In September, the adjudication was set aside and a new plan was filed. This plan was eventually confirmed, but has not yet been consummated.

### PLEADINGS ON UNIVOX CLAIM

Univox filed its proof of claim for damages of $129,308.93 on May 3, 1976. An objection to this claim was filed on December 17, 1976. January 21, 1977, an answer and counterclaim were filed to the objection and this counterclaim alleged that Univox's claim was not dischargeable under Sections 17(a)(2), (3), (4) & (8). On July 24, 1978, an amended objection was filed, raising the defenses of the claim being tardy and lack of notice, and also including a counterclaim. August 21, 1978, Univox filed a reply, alleging the counterclaim was not raised timely. Answer to this pleading was filed November 14, 1978. February 1, 1979, the court disallowed the original claim for being filed late. On February 4, 1980, Morweld filed its motion for a summary judgment.

### STATE COURT PROCEEDINGS

On October 21, 1975, Univox brought suit against the Taylors in a State Circuit Court to foreclose on the mortgage set forth above. In their answer, the Taylors raised the defense of payment through the credits allowed to Univox by Morweld. At the trial held June 27 and 28, 1977, Univox claimed that because of the defects in the reels, Morweld was not entitled to the amounts represented by the said credits. The State court judge found in favor of Univox and found that, while no notice was given to Morweld of the defect, that such notice was excused because Morweld was "in bankruptcy" and because Morweld had been aware of the defects and had been notified of them by the Army in December of 1975. An appeal was taken from that decision and the trial court was affirmed. An application for a delayed appeal to the State Supreme Court was denied.

## DISCUSSION

### I. *Accelerated Judgment.*

Fed.R.Civ.P. 56 provides that a party seeking to recover upon a claim, counter-claim, or cross-claim may at any time move for a summary judgment in his favor upon all or any part thereof. If the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact, a summary judgment may be rendered on the issue.

Bankruptcy Rule 756 provides that Rule 56 applies in adversary proceedings. The Advisory Committee's note to Bankruptcy Rule 756 states:

> "Rule 56 of the FRCP has frequently been deemed applicable in contested proceedings in bankruptcy cases."

This case is especially appropriate for summary proceedings in order to economize on the time of the parties and the court.

In *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir., 1962), the court stated:

> "In ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponents' are indulgently treated.
>
> "It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute...'"

### II. *Necessity of Notice.*

1. *Pre U. C. C. law—*

█ Even before the enactment of the Uniform Commercial Code (hereafter U. C. A.), notice of defects was required.

In *Frank v. Brown*, 255 Mich. 415, 238 N.W. 237 (1931), in a mortgage foreclosure suit, an intervenor sought to set aside an assignment of the mortgage, claiming it had been given in consideration of some foxes as to which the assignee had made fraudulent representations. A decree in favor of the intervenor was reversed on appeal. The court observed that although the intervenor discovered the alleged fraud in April, 1924, it made no complaint to the assignee prior to the filing of the suit, November 30, 1926.

In *Matchless Electric Co. v. Morley Brothers*, 252 Mich. 144, 233 N.W. 202 (1930), defendants ordered 8,000 flashlight and automobile bulbs from plaintiff. Delivery was made December 10, 1927. On December 20, defendant examined the bulbs and found them to be 40% defective. It was not until February 4, 1928, that defendant finally wrote plaintiff advising of the result of the examination. The trial court granted a directed verdict for the plaintiff. The court stated at pp. 147–148, 233 N.W. 202:

> "It was defendant's duty to make such inspection as it desired, and to accept or reject the goods within a reasonable time. It claimed it ascertained by December 20th that as many as 40 per cent. of the bulbs examined were defective. No reason was shown for delay, and the notice of rejection on February 4th and 7th contained nothing which defendant had not discovered before December 20th. The time elapsing was clearly unreasonable and resulted in an acceptance of the goods as a matter of law. *Foster v. Rowley*, [110 Mich. 63, 67 N.W. 1077] supra; *Sisson Lumber & Shingle Co. v. Haak*, 139 Mich. 383, [102 N.W. 659]; *Stone v. Frohlich*, 168 Mich. 128, [133 N.W. 951].
>
> "Aside from all other considerations, defendant's action in ordering the bulbs returned to it and continuing to hold them, after it had rejected and shipped them to plaintiff, was an act inconsistent with the ownership of plaintiff and constituted an acceptance in law. *Kupfer v. Michigan Clothing Co.*, [141 Mich. 325, 104 N.W. 174] supra."

### 2. U. C. C.

The U. C. C. was adopted in Michigan in 1962 and became effective January 1, 1964. *P. A. Mich. Act 174, 1962.*

Sec. 2602, Mich.Comp.Laws Sec. 440.2602 [Mich.Stat.Ann. Sec. 19.2602 (Callaghan 1975)] provides:

"(1) Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."

Again, Sec. 2606(1), Mich.Comp.Laws Sec. 440.2606(1) [Mich.Stat.Ann. Sec. 19.2606(1) (Callaghan 1975)] states:

"Acceptance of goods occurs when the buyer

(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

(b) fails to make an effective rejection (subsection (1) of section 2602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him."

Once there has been acceptance under Section 2606, "The buyer must pay at the contract rate for any goods accepted." U.C.C. Sec. 2607(1), Mich.Comp.Laws Sec. 440.2607(1) [Mich.Stat.Ann. Sec. 19.2607(1) (Callaghan 1975)] And again, after acceptance, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy * * *" U.C.C. Sec. 2607(3)(a), Mich.Comp.Laws Sec. 440.2607(3)(a) [Mich.Stat.Ann. Sec. 19.2607(3)(a) (Callaghan 1975)]. The comments of the National Conference of Commissioners and American Law Institute sets forth the purposes of this Section, stating:

" * * The notification that saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation."

Note that the U. C. C. requires that the *buyer* notify the seller of the breach and the purpose of this notification is to open the way "for normal settlement through negotiation." The U. C. C. defines "notification" in Sec. 1201(26), Mich.Comp.Laws Sec. 440.120(26) [Mich.Stat.Ann. Sec. 19.-1201(26) (Callaghan 1975)] as follows:

"A person 'notifies' or 'gives' a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it."

The comments of the National Conference and A.L.I. on this Section notes that the word "notifies" is new and adds, "This is the word used when the essential fact is the proper dispatch of the notice, not its receipt * *"

"Reasonable time" is also defined by the statute, and after recognizing that the parties may agree as to what will be a reasonable time, provides in U.C.C. Sec. 1204(2), Mich.Comp.Laws Sec. 440.1204(2) [Mich.Stat.Ann. Sec. 19.1204(2) (Callaghan 1945)]:

"What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action."

### 3. Post U. C. C. cases—

In *Michigan Sugar v. Jebavy-Sorenson Orchard Co.*, 66 Mich.App. 642, 239 N.W.2d 693, *lv. to appeal den.* (1976), suit was brought to recover the purchase price for sugar. A counterclaim was filed for breach of implied warranty. The trial judge granted a summary judgment on plaintiff's suit and after trial allowed the counterclaim. The purchaser claimed that there was excessive pan scale in the sugar, an imperfection. Of 800 bags, 68 were returned and were replaced. The purchaser was aware of pan scale in other bags but it accepted them anyway. Shipment was in 1969. Apples processed by the purchaser were sold but not shipped until the spring of 1971. These were rejected and were sold by the purchaser at a loss. The court of

appeals reversed the holding of the trial court, finding that the notice was not within a commercially reasonable time under the U. C. C. This case was published in A.L.R.3d with an extensive annotation at 93 A.L.R.3d 363. This annotation covers the sufficiency and timeliness of notice under U.C.C. Sec. 2607. At page 368 the annotation states:

"The notice provided for in this section is designed to allow the defendant seller an opportunity for repairing the defective item, reducing damages, avoiding defective products in the future, negotiating settlements, and protecting against stale claims."

In view of the completeness of the said annotation, nothing would be gained by considering the many cases cited and discussed therein.

In a case decided since *Michigan Sugar v. Jebavy-Sorenson Orchard Co., Supra, Steel & Wire Corp. v. Thyssen Inc.*, 20 U.C.C.Rep. 892 (U.S.D.C., E.D.Mich., 1976) the buyer sued for damages caused by steel not conforming to its purchase order. Plaintiff first learned that the steel was too hard in late September of 1974. The best that plaintiff could show was that at some date between September 1974 and July 1975 notice was given of the defect. The court, in granting a summary judgment for the defendant, held that, "It is well settled that a plaintiff asserting a breach of warranty under the U. C. C. must plead and prove reasonable notice as a prerequisite of recovery." The court also held that the burden of proof was on the buyer. The court also listed the purpose of notice:

"In determining whether industry practice should be held to be controlling in this case, it is helpful to look at the policies behind the notice requirement contained in UCC § 2–607(3)(a). One commentary identified three such policies: (1) To enable the seller to make adjustments or replacements or to suggest opportunities for cure; (2) to afford the seller an opportunity to prepare for litigation; and (3) to bring a finality to all claims. White & Summers, Uniform Commercial Code (1972), p. 344. Another commentary identified the same three policies. 3 Williston on Sales (4th Ed.), § 22–11, p. 304. It is stated in the Official Comment to § 2–607 that the rule requiring reasonable notice is designed 'to defeat commercial bad faith'. All of these policies would be defeated if a group of buyers were allowed in effect to set their own standards as to when they have to notify their sellers of a breach. On the facts of this case, industry practice cannot excuse the delay in giving the defendant notice of the alleged breach."

Inter alia, the district judge stated that the fact that the case would be tried without a jury was irrelevant in determining whether summary judgment was appropriate, citing 6 Moore's Federal Practice par. 56.02[7] and *United States v. J. B. Williams Company, Inc.*, 498 F.2d 414, 430 n.19 (2d Cir., 1974). The court also recognized that the notice requirement was more strictly enforced against merchants than consumers.

Other recent cases holding that timely notice of deficiencies must be given by a buyer are, *Lewis v. Valley*, 476 F.Supp. 67 (W.D.Ky., 1979); *Kopper Glo Fuel, Inc. v. Island Lake Coal Co.*, 436 F.Supp. 91 (E.D. Tenn., 1977); *Cotner v. International Harvester Co.*, 260 Ark. 885, 545 S.W.2d 627 (1977); *Voboril v. Namco Leisure World, Inc.*, 24 U.C.C.Rep. 614 (Conn.Sup.Ct., 1978).

In the discussion of the notice requirement, 2 Anderson on the Uniform Commercial Code (2d Ed., 1971) 210 it is stated:

"A buyer who has accepted the seller's tender of delivery must notify the seller of any breach. If such notice is not given the buyer is barred from asserting any remedy to which the breach would otherwise give rise.

"The notice of a breach of warranty is in the nature of a condition precedent to the right of the warranty plaintiff to recover damages."

Again at p. 216 on burden of proof:

"The buyer has the burden of proving both the fact of having given notice and that it was timely given."

Also at page 219:

"The bringing of an action to recover damages for breach of warranty cannot

be regarded as the notice of breach contemplated by UCC § 2–607(3), for whether an action can be brought, that is, whether a remedy is available, is conditioned upon whether notice had been given of the breach. Consequently, where no notice is given prior to the bringing of the action an essential condition precedent to the right to bring the action does not exist and by hypothesis the buyer-plaintiff has lost the right to his remedy.

"Under the pre-Code law there was authority that a buyer's conduct in promptly bringing an action against the seller for breach of contract was a sufficient notice. This view is in technical conflict with decisions holding that notice is a condition precedent to the right to sue, and it would appear that the obligation under the Code to act in good faith would require that the buyer not only give notice but do so under such circumstances that the seller might have the opportunity, if he desired to avail himself of it, to remedy his breach without the buyer jumping into a lawsuit."

The 1980 Supplement also cites *Pace v. Sagebrush Sales Co.*, 114 Ariz. 271, 560 P.2d 789 (1977) as authority that the filing of a counterclaim by a defendant buyer when sued for the purchase price was not a timely notice.

4. *Standard Alliance Industries Inc. v. The Black Clawson Co.*, 587 F.2d 813 (6th Cir., 1978).—

Here, the plaintiff, a manufacturer of railroad car axles, purchased an automatic forging machine from defendant. Installation was completed by October 1967. Troubles started at once and plaintiff sent a letter to defendant outlining the machine's problems. For over five months, both parties labored to make the machine operable. On June 21, 1968, defendant ceased working on the machine. September, 1968, plaintiff sold its Standard Forgings Division and the purchasers also attempted to get the machine to work. The court action was filed in May of 1969. The trial court found for the buyer. Among other issues raised was that of notice, it being the claim of defendant that plaintiff's failure to report the machine's defects barred the suit. The district judge submitted the notice issue to the jury which found for the plaintiff. The trial judge refused to overrule the jury's decision and enter a judgment n. o. v. for the defendant. The appellate court in a unanimous decision stated at p. 823:

"Moreover, inasmuch as section 2–607 operates as a condition precedent to any recovery, the burden of proof is on the plaintiff to show that notice was given within a reasonable time. *Ehlers v. Chrysler Motor Corp.*, [88 S.D. 612], 226 N.W.2d 157, 159 (1975); *Schnabl v. Ford Motor Co.*, 54 Wis.2d 354, 198 N.W.2d 161 (1972); *L. A. Green Seed Co. of Arkansas v. Williams*, supra, [246 Ark. 463], 438 S.W.2d [717] at 719–20."

The Court then continues at p. 825:

"We think that notice should have been given. Section 2–607 expressly requires notice of 'any' breach. Comment 4 says that notice 'need only be such as informs the seller that the transaction is claimed to involve a breach.' The express language of the statute and the official comment mandate notice regardless whether either or both parties had actual knowledge of breach. See *Cotner v. International Harvester Co.*, supra.

"We also note that this same result would take place under § 2–607's predecessor, section 49 of the Uniform Sales Act. Judge Learned Hand's oft-quoted words applying section 49 are equally applicable here:

" 'The plaintiff replies that the buyer is not required to give notice of what the seller already knows, but this confuses two quite different things. The notice 'of the breach' required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of buyer's claim that they constitute a breach. The purpose of the notice is to advise the seller that he must meet a claim for damages, as to which, rightly or wrongly, the law requires that he shall have early warning.'

"*American Mfg. Co. v. United States Shipping Board E. F. Corp.,* 7 F.2d 565, 566 (2d Cir. 1925), cited with approval in *Columbia Axle Co. v. American Automobile Ins. Co.,* 63 F.2d 206 (6th Cir. 1933). See *Eastern Air Lines v. McDonnell Douglas Corp.,* 532 F.2d 957, 971–972 (5th Cir. 1976); *Bloch v. Eastern Mach. Screw Corp.,* 281 F. 777 (6th Cir. 1922); *Champion Animal Food Co. v. L. B. Reich Distributing Co.,* 78 N.E.2d 180 (Ohio App. 1947).

"An examination of the policy reasons which underlie 2–607 further support our view. Notice of breach serves two distinct purposes. First, express notice opens the way for settlement through negotiation between the parties. Comment Four, supra; *Eckstein v. Cummins,* 41 Ohio App.2d 1, 321 N.E.2d 897, 901 (1974). Second, proper notice minimizes the possibility of prejudice to the seller by giving him 'ample opportunity to cure the defect, inspect the goods, investigate the claim or do whatever may be necessary to properly defend himself or minimize his damages while the facts are fresh in the minds of the parties.' Note, Notice of Breach and the Uniform Commercial Code, 25 U.Fla.L.Rev. 520, 522 (1973). See *Eastern Air Lines v. McDonnell Douglas Corp.,* supra, at 972–73. Compare 3 Williston on Sales (4th Ed.), § 22–11 and J. White & R. Summers, supra at 344 which identify three policy reasons behind the notice requirement: 1) To enable the seller to make adjustments or replacement or to suggest opportunities for cure; 2) To enable the seller to prepare for negotiation or litigation; and 3) To give the seller peace of mind from stale claims. See *Steel & Wire Corp. v. Thyssen, Inc.,* 20 U.C.C.Rep. 892 (E.D. Mich.1976). See also *Mattos, Inc. v. Hash,* 279 Md. 371, 368 A.2d 993, 996 (1977) (protection against stale claims is the purpose of the statute of limitations, not the purpose of section 2–607(3))."

The court also points out that the law holds merchants to higher standards of good faith than consumers. Page 827.

The judgment for breach of warranty was reversed and the judgment on the counterclaim was affirmed.

5. *Conclusion on notice.*

This court is bound by the decision of the Court of Appeals for this Circuit. Applying the reasoning of *Standard Alliance Industries Inc. v. The Black Clawson Co., Supra,* I can reach no other conclusion but that there is no issue of fact. No notice was given to Morweld by Univox of the alleged breach until the filing of the proof of claim on May 3, 1976. It is true that Univox brought its suit against the Taylors October 21, 1975, but this was a suit to foreclose a mortgage. While evidence was adduced to prove the breach in that suit, that trial was not held until June, 1977. The Court of Appeals in commenting on the pleadings indicated there was merely a complaint to foreclose a mortgage and an answer claiming payment. Thus, there was nothing in the pleadings to alert Morweld to the claimed defects.

III. *Res Judicata or Collateral Estoppel.*

1. General—

It is the claim of Univox that this Court is bound by the decisions in the State Courts which held in favor of Univox and against the Taylors on the mortgage foreclosure proceedings. There is no indication that the failure to give the notice as required by the U.C.C. was raised as a defense. The only discussion in the decision of the trial judge was as follows:

"The Defendant and Morweld were not notified of this noncompliance until sometime in December—the precise date escapes me—when witness Beller talked to the Defendant, Maurice Taylor. The Court finds that it was reasonable that Plaintiff not consult the Defendant regarding the rejections in view of the nature of the July notice received regarding noncompliance. In any event it appears that the Defendant and the corporation through Defendant were aware that there was a noncompliance with certain specifications, specifically the inability of the reel to withstand the drop-test."

The Court speaks of knowledge by Taylors and notice by the Army representative but no where is there a finding that Univox gave notice to Morweld nor is there any mention of the U. C. C. requirements of notice. The pleadings in the State proceedings have not been made available to this Court so whether the requirement of notice was raised in those pleadings is unknown as far as this record is concerned. As stated above, the Court of Appeals mentioned no such allegation when discussing the pleadings.

2. *Res Judicata—*

■ There is a distinction between res judicata and collateral estoppel in Michigan. In a recent decision the Michigan Court of Appeals discussed that distinction:

"At the outset, we observe that defendants in their 'motion for accelerated and summary judgment' have confused res judicata with collateral estoppel. Res judicata is inapplicable to the present situation because the two causes of action are different. See *Howell v. Vito's Trucking and Excavating Co.*, 386 Mich. 37; 191 N.W.2d 313 (1971). In *Herzog*, the doctors sued for dissolution of the partnership whereas in this case the plaintiffs sued for monetary damages based on theories of breach of fiduciary relationship, breach of contract, and third-party beneficiary. As distinguished from res judicata, collateral estoppel bars relitigation of issues previously decided in the first action between the same parties where the second cause of action is different from the first cause of action. *Howell v. Vito's Trucking and Excavating Co.*, supra, at 41–42, *Jones v. Chambers*, 353 Mich. 674, 680–681; 91 N.W.2d 889 (1958). See also *Braxton v. Litchalk*, 55 Mich.App. 708, 717–718; 223 N.W.2d 316 (1974). We note that the bar of collateral estoppel extends only to questions of fact that were 'actually litigated' in the previous cause of action. *Senior Accountants, Analysts & Appraisers Association v. Detroit*, 399 Mich. 449, 458; 249 N.W.2d 121 (1976), *People, ex rel. Director of Conservation v. Babcock*, 38 Mich.App. 336, 346; 196 N.W.2d 489 (1972). We defined the requirement of being 'actually litigated' in *Sahn v. Brisson*, 43 Mich.App. 666; 204 N.W.2d 692 (1972):

"'A question has not been actually litigated until put in issue by the pleadings, submitted to the trier of fact for a determination, and thereafter determined.' (Citation omitted.) *Sahn v. Brisson*, supra at 670.

"The trial judge in this opinion also confused res judicata and collateral estoppel. He found that res judicata did not bar plaintiffs' claims because the issue of the doctors' status was never actually litigated. If plaintiffs' claim was barred, this bar would occur by operation of collateral estoppel, and not res judicata." *Sharp v. Two Point Associates, Ltd.*, 78 Mich.App. 180, 259 N.W.2d 416 (1977).

Certainly in this case there can be no claim that the mortgage foreclosure against the Taylors is the same cause of action as a claim for damages due to breach of contract against Morweld. Therefore, there is no res judicata problem in this case.

It must be kept in mind that there is some difficulties on nomenclature. Although, the Michigan Courts make a distinction between res judicata and collateral estoppel, this is not universal.

"§ 397—Terminology.

"Although there are some cases that confine the term 'res judicata' to that aspect of the doctrine which precludes the relitigation of the same cause of action, the term, in its literal meaning of a 'matter adjudged,' is broad enough to include, in addition, the other aspect of the doctrine, which precludes the relitigation of the same facts or issues in a subsequent action on a different cause of action, and the term 'res judicata' is, indeed, so used in numerous cases. In this respect, it has been declared that if a party is barred from relitigating a matter, it can make little difference to him by what name the lethal doctrine is called. On the other hand, the confusion and looseness of thought resulting from the absence of distinctive terms to describe each aspect of the doctrine has been well pointed out.

"The term 'estoppel' has frequently been used in connection with the doctrine of res judicata, not only with respect to the relitigation of particular issues in a subsequent action on a different cause of action, but also with respect to the relitigation of the same cause of action. In some cases, the term 'estoppel by judgment' has been used to describe the effect of a judgment to preclude relitigation of the same cause of action, and the phrase, 'estoppel by verdict,' to describe the effect of the former proceeding to preclude further litigation of the particular facts on which the jury necessarily made findings in the former action. The decisions have not, however, been uniform in this respect, and in some opinions the term 'estoppel by judgment' has been used to describe the rule precluding the relitigation of particular issues in a subsequent action on a different cause of action. Sometimes, the term estoppel by record is so used. The more recent tendency is to describe the latter aspect of the doctrine of res judicata as a 'collateral estoppel' or a 'collateral estoppel by judgment,' as distinguished from the 'direct estoppel by judgment' where the earlier and later causes of action are identical.

"The doctrine precluding the relitigation of the same cause of action has also been referred to as the doctrine of merger, which, with respect to its primary function, bars subsequent actions on the original cause of action, but it is worthy of notice that certain matters unrelated to the doctrine of res judicata also arise in connection with the application of the doctrine of merger.

"For convenience, the two aspects of the doctrine of res judicata have also been referred to as 'claim preclusion' and 'issue preclusion.' " 46 Am.Jur.2d Judgments Sec. 397 (1969).

### 3. *Collateral estoppel—*

#### a. *Applicable law—*

■ In a diversity case, State law determines the applicability of collateral estoppel, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 517, 82 L.Ed. 1188 (1938), *Hackler v. Indianapolis & Southern Trailways, Inc.*, 437 F.2d 360 (6th Cir., 1971). While this is not a diversity case, the District Court would have had no jurisdiction over the proceedings except either by diversity or consent to jurisdiction. Here, by filing its proof of claim with the Court, jurisdiction has been consented to. Section 2(a)(7) of the Bankruptcy Act of 1898. *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). Thus, it would appear that the same rule should apply in this case as in a diversity case and State law will apply.

#### b. *Mutuality—privity—*

"A final Judgment on the merits, rendered by a Court of competent jurisdiction, is conclusive as to the rights of the parties and their privies * *." 46 Am.Jur.2d Judgments Sec. 404 (1969). Obviously the parties in our case were different. But, is Morweld a privy of the Taylors? There is no question that Taylors were the sole stockholders and officers of Morweld. "A judgment for or against an officer or director usually is not res judicata in favor of or against the corporation, but such a judgment may be conclusive in special circumstances where an identification of interest appears." 50 C.J.S. *Judgments* Sec. 764. It has been widely held ". . . that there is no 'privity' between a corporation and its controlling stockholder for purposes of res judicata".

■ A party has the right to appear in a suit and to defend himself even though he may have assisted in the defense of a case against another party in a previous case. *Bigelow v. Old Dominion Copper Mining & Smelting Co.*, 225 U.S. 111, 32 S.Ct. 641, 56 L.Ed. 1009 (1912).

In *American Range Lines, Inc. v. Com'r of Internal Revenue*, 200 F.2d 844 (2d Cir., 1952), the Second Circuit disagreed with a Third Circuit decision involving the sole stockholder of the taxpayer, stating at p. 845:

"We also agree with the Tax Court that the decision in the earlier suit does not here constitute res judicata or estoppel by verdict inasmuch as the parties to the two suits are not the same. As Mrs. Rogers availed herself of the corporate form for substantial business purposes, neither the taxpayer corporation nor Mrs. Rogers may insist, in tax litigation such as this, that the corporation should be disregarded to the end that the parties to the suits be deemed identical. We regard as inapposite cases holding that in some circumstances a stockholder may be bound by a prior adjudication in a suit brought by his corporation: The proposition that the corporation's acts may bind the stockholder for such purposes does not support the converse proposition."

■ The claim that issues determined against the sole stockholders collaterally estop the corporation are based on the premise that the stockholders are the only parties with an interest in the corporation. This is not true. There are also employees, suppliers, customers and even communities that also have an interest in a corporation. In the case of Morweld, those having the primary interest at the time of the mortgage foreclosure proceedings were the creditors. A plan of arrangement had been confirmed and although the order confirming the plan was on appeal, no stay was issued. Under the plan, Morweld was still under the jurisdiction of the United States District Court. The consummation of the plan depended upon the success of Morweld and no rights of that corporation could be released by it except on approval of the U. S. District Court through a referee in bankruptcy or a U. S. District Judge. This same situation existed at the time of the State Court trial. 1 B. Moore's Federal Practice pp. 3135–3136 (2d Ed., 1980) states:

"The doctrine of res judicata, as applied to the bankruptcy court in deciding whether a claim should be allowed, disallowed or subordinated, is subject to the paramount equitable powers of bankruptcy courts to prevent the perpetration of fraud and collusion. And privity between the bankrupt and the trustee is not

so complete that a judgment, which binds the bankrupt, is always conclusive upon the creditors or their representative, their trustee. At times it is not."

The plan of Morweld as accepted by the creditors provided for the continued retaining of jurisdiction by the Federal Court so that the rights of creditors be protected. No transfer of assets other than in the normal course of business would be effective without the approval of the Court. This would include any waiver of rights as to accounts receivable. At the time of the hearing in the State Court, the Taylors may have been the sole stockholders and the only officers of Morweld and may have been in control as to the day by day operations of the corporation, but they were otherwise very limited in their authority.

I find as a matter of fact and law that there was no privity between the Taylors and Morweld at the time of the State Court action. Thus, there could neither be res judicata nor collateral estoppel as to Morweld's claim against Univox.

c. Collateral estoppel—

The rule of collateral estoppel is set forth in *Howell v. Vito's Trucking and Excavating Co.*, 386 Mich. 37, 191 N.W.2d 313 (1971), where the Court states at p. 42, 191 N.W.2d 313:

" 'On the other hand, where the subsequent action is based upon a different cause of action from that upon which the prior action was based, the effect of the judgment is more limited. The judgment is conclusive between the parties in such a case as to questions actually litigated and determined by the judgment. It is not conclusive as to questions which might have been but were not litigated in the original action. This is the doctrine of collateral estoppel.'

"These controlling principles have been long and well recognized by this Court. *Jones v. Chambers* (1958), 353 Mich. 674, and authorities cited therein."

See also *Senior Accountants, Analysts & Appraisers Assoc. v. Detroit*, 399 Mich. 449, 249 N.W.2d 121 (1976) (*obiter dictum*); *Lilienthal v. City of Wyandotte*, 286 Mich. 604,

282 N.W. 837 (1938); *Jacobson v. Miller*, 41 Mich. 90, 1 N.W. 1013 (1879); *Local 98 v. Flamegas Detroit Corp.*, 52 Mich.App. 297, 217 N.W.2d 131 (1974), Lv. to App. granted 392 Mich. 793 (1974) but no further record in Mich.Reports.

■ d. *Was this issue of notice raised?* —I do not find any indication that the issue of notice by Univox was raised in the State Court nor was any mention made of the U. C. C. requirement for notice. The judge only found that no notice was required because of the "bankruptcy," the fact that Morweld was aware of the defect and that the Army notified Morweld of the defects in December 1975.

In the unpublished opinion of the Mich. Court of Appeals dated April 19, 1979, there is no mention of notice. The Court stated at page 2 of its opinion:

"This present action was commenced on October 21, 1975, when plaintiffs filed a complaint to foreclose the mortgage on the real property held by defendants for nonpayment of the mortgage debt. Defendants answered alleging payment but asserting no affirmative defenses."

The Court concluded at p. 3:

"We are convinced that since the viability of the credits as a method of payment for indebtedness was contingent upon the delivery of conforming reels, that the note was not paid through the grant of these provisional credits. Accordingly, the order of foreclosure was proper since the note was overdue and had not been paid.

The issue of notice by buyer not having been presented in the State proceedings, there can be no collateral estoppel.

## CONCLUSION

Having failed to give the notice required by the U. C. C., the buyer cannot now claim that the goods received and accepted were defective.

The motion for summary judgment is granted and these proceedings will be set for trial solely on the question of damages on the counterclaim.